628 A.2d 197

Peter J. ANDRULIS, Jr. et ux.

v.

LEVIN CONSTRUCTION CORPORATION,
d/b/a The Leviń Companies.

No. 101, Sept. Term, 1992.

Court of Appeals of Maryland.

July 28, 1993.

**356**

Michael I. Greenberger (William S. Moore, Elizabeth M. Brown, Shea and Gardner, on brief), Washington, DC, for petitioners.

John P. McKenna, Jr. (O'Malley & Miles, on brief), Upper Marlboro, MD, for respondent.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI and ROBERT M. BELL, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired), Specially Assigned.

RODOWSKY, Judge.

This is an action for breach of a construction contract brought by homeowners against the builder. Two legal issues are presented. The first involves implied warranties under Maryland Code (1974, 1988 Repl.Vol., 1992 Cum.Supp.), § 10–203 of the Real Property Article.[1] That question is whether § 10–203 warranties include work done by the builder other than in or on the dwelling house. The second issue is whether the trial court properly invoked the principle of economic waste in order to limit expectation interest damages for certain deficiencies in the work.

In 1987 Levin Construction Corporation (Levin) commenced construction of the house located at 7220 Armat Drive, Bethesda, Montgomery County, Maryland. The next year Levin offered the substantially completed dwelling and lot for sale. Peter J. Andrulis, Jr. and Marilyn W. Andrulis (the Andrulises), husband and wife, entered into a contract with Levin (the Contract) under which Levin agreed to add certain features, including a forty foot by sixteen foot swimming pool to be constructed in the spring of 1989. The Andrulises promised

---

1.  Unless otherwise noted all statutory references are to the Real Property Article.

to purchase the land and improvements for $1,276,900, consisting of $1,241,900 cash at closing and a $35,000 promissory note. At the closing, held in December 1988, $15,748 of the cash was escrowed to cover specified, incomplete work that should have been completed by closing.

The instant action was commenced in February 1990 in the Circuit Court for Montgomery County as a complaint for interpleader by the escrowee. The Andrulises were designated as plaintiffs and Levin as defendant. A court trial of the matter consumed ten days, in stages, between May and July 1991, resulting in a finding that the Andrulises were entitled to $138,033 in damages. The note was declared paid and satisfied, and the interpleaded funds were awarded to the Andrulises. After those credits, including interest, judgment was entered against Levin for $78,616.40. The order entering judgment listed thirty deficiencies and specified the amount awarded as to each.

Levin appealed to the Court of Special Appeals. That court, in an unreported opinion and for reasons to be set forth, *infra,* affirmed in part, reversed in part, and remanded for further proceedings. The Andrulises petitioned for certiorari, and Levin conditionally cross-petitioned. We granted both petitions.

I

A general description of the premises is required for an understanding of the legal issues concerning warranties.

A

7220 Armat Drive is a trapezoidally shaped lot. The street frontage, which is the north side of the lot, is 87 feet.[2] The rear, or south, lot line is 78 feet. The western boundary is 147 feet, while the eastern is 206 feet. The three-story brick house faces the street, and is approached by a circular driveway. From entrance to rear the building measures 56 feet.

---

2. All measurements are rounded off to eliminate decimals.

For most of that depth the width of the house is 71 feet. Included in the building on its east side is a one and one-half story, two car garage facing the street. Behind the house is a large patio, and behind the patio is the swimming pool.

The distinctive feature of the lot is that, moving from the north boundary to the south boundary, the ground ascends from an elevation of 30 feet to perhaps 58 feet. The front entrance to the house, reached by an outside staircase, is seven feet above ground level, but the rear entrances are level with the patio. The in-ground swimming pool is at a higher elevation than the patio, and the pool's water surface and its surrounding concrete apron or "bib" create a terrace in the slope ascending from the patio to the south boundary. There is an outside walkway, connecting the patio to the front lawn, on the west side of the house. As a result of this construction at varying elevations, there are retaining walls between the house and the property's rear, west, and east boundaries. The walls to the rear and on the west side are made of brick, with large planters incorporated into the total configuration of walls and steps.

Specifically, there are staircases, planters, and a brick retaining wall on the north, or house, side of the pool, rising from the patio level to the pool level. There is a brick retaining wall on the south side of the pool, supporting the slope from the pool to the rear of the premises. There are brick retaining walls on the east and west sides of the pool. There is a brick retaining wall on the west side between the walkway and the boundary. There is also a timber retaining wall on the east side of the house.

The circuit court found that the § 10–203 warranties had been breached by defects in the above-described work. That finding was based principally on the testimony of the Andrulises' expert, John Thomas (Thomas), an architect and builder. Much of the testimony relevant to the instant § 10–203 issue had to do with drainage of surface water and of percolating ground water. Thomas described either the absence of or

deficiencies in, moisture protection or waterproofing, weepholes, and foundation drainage systems.

Levin submits that the maximum "swing" on the § 10–203 issue is $41,040, consisting of the following items:

| | |
|---|---:|
| West side retaining wall | $10,000.00 |
| Waterproofing of retaining walls | 6,000.00 |
| Retaining wall weepholes | 4,500.00 |
| Sidewalk caulking | 600.00 |
| Garage | 5,000.00 |
| Timber retaining wall | 1,100.00 |
| Rear yard, catch basin, and grates | 4,130.00 |
| Planter drains and tie-ins | 5,510.00 |
| Pool lights and light covers | 1,000.00 |
| Patio slab | 2,500.00 |
| Front walkway | 450.00 |
| Fence posts | 250.00 |
| Total | $41,040.00 |

The Court of Special Appeals concluded that, of the above-listed items, only the garage was clearly within the § 10–203 warranty and that those items described as west side retaining wall, waterproofing of retaining walls, retaining wall weepholes, and timber retaining wall would be within the warranty, if those "walls are *necessary* for the house's structural stability." Under the mandate of the Court of Special Appeals, that factual issue would be determined on remand.[3]

## B

Under the common law of Maryland, except in unusual circumstances, " 'there is no implied warranty in the sale of a completed residence.' " *Thomas v. Cryer*, 251 Md. 725, 726, 248 A.2d 795, 795 (1969) (quoting *Allen v. Wilkinson*, 250 Md. 395, 398, 243 A.2d 515, 517 (1968)). The General Assembly responded to the absence of warranties by Chapter 151 of

---

**3.** The item headed, "Garage," refers to the parking pad or driveway in front of the garage doors, and not to the two-car garage structure, *per se*. The pitch of the pad is toward the garage, causing surface water to flow in that direction and to penetrate the garage itself.

the Acts of 1970 which, as amended, is now Title 10, Subtitle 2, "Express and Implied Warranties." Section 10–203(a), in its aspects relevant to the issue before us, has been substantially unchanged since its enactment in 1970. Those relevant parts read:

> "[I]n every sale, warranties are implied that, at the time of the delivery of the deed to a completed improvement or at the time of completion of an improvement not completed when the deed is delivered, the improvement is:
>
> (1) Free from faulty materials;
>
> (2) Constructed according to sound engineering standards;
>
> (3) Constructed in a workmanlike manner; and
>
> (4) Fit for habitation."

Definitions for the subtitle, as originally enacted, provided that " '[i]mprovements' includes all fixtures and structures attached to realty IN THE NATURE OF PRIVATE DWELLING UNITS." The capitalized words were added to the definition in the course of passage of Chapter 151.

The definition of improvements was amended by Chapter 694 of the Acts of 1971. Preambles to the bill advise that the subtitle "was intended to cover newly constructed homes only," and that "[t]here is some confusion as to whether or not this law applied to or applies to already existing homes or would cover improvements made by individual homeowners." The 1971 enactment then made the following amendment (italics indicate new matter in the bill as introduced to then existing law; brackets indicate matter deleted from then existing law by the bill as introduced; and capitals indicate amendments in the course of passage):

> " 'Improvements' includes all *newly constructed private dwelling units and all* fixtures and structures [attached to realty in the nature of private dwelling units] *which are made a part of the newly constructed private dwelling units at the time of their construction by BUILDING contractors and subcontractors.*"

Following Code revision, that definition, now found in § 10–201(b), reads:

" 'Improvements' includes every newly constructed private dwelling unit, and fixture and structure which is made a part of a newly constructed private dwelling unit at the time of construction by any building contractor or subcontractor."

The Revisor's Note to § 10–201 advises that the only changes to subsection (b) "are in style." Md.Code (1974), Revisor's Note following § 10–201.

## C

The Andrulises contend that each of the disputed items is a "fixture [or] structure which [was] made a part of [the] newly constructed private dwelling unit" constructed by Levin under the Contract. Levin, on the other hand, contends that the Court of Special Appeals properly considered legislation enacted after the 1970 adoption of Subtitle 2 in order to construe "improvements" as used in the earlier legislation.

Chronologically the analysis begins with Chapter 31C, "New Home Warranty and Builder Licensing," of the Montgomery County Code (MCC) as enacted by 1986 Laws Montgomery County ch. 49, § 1. That legislation requires the County Executive to establish by regulation the terms of a new home warranty, including minimum performance standards. MCC § 31C–3(a). A new home warranty security fund is created to guarantee the payment of warranty claims, and that fund is derived from assessments on builders. MCC § 31C–5.

By Executive Regulation No. 22–86 (Exec.Reg.), the Montgomery County Executive implemented the local legislation. Following the provisions for warranties and standards, Exec. Reg. § 4.10.d, headed "Exclusions from Warranty Coverage," in part provides:

"1. Defects in outbuildings including detached garages and detached carports, except outbuildings which contain the plumbing, electrical, heating, cooling or ventilation systems serving the home; swimming pools and other recreational

facilities; driveways; walkways; boundary walls; retaining walls; bulkheads; fences; landscaping, including sodding, seeding, shrubs, trees, and plantings; off-site improvement or any other improvements not a part of the home itself."

Section 8.1 of Exec.Reg. 22–86 permits a builder to use a "private Alternate New Home Warranty Security Plan" if approved by the county agency administering the program. In the instant matter, and in compliance with the local law, Levin furnished the Andrulises "Insurance/Warranty Documents" issued by Home Owners Warranty Corporation. That warranty excludes, *inter alia,*

"[d]efects in outbuildings including, but not limited to detached garages and detached carports (except outbuildings which contain the plumbing, electrical, heating, cooling or ventilation systems serving the Home); site located swimming pools and other recreational facilities; driveways; walkways; patios; boundary walls; retaining walls; bulkheads; fences; landscaping (including sodding, seeding, shrubs, trees and plantings); off-site improvements; or any other improvements not a part of the Home itself."

The General Assembly of Maryland, aware of the Montgomery County program, addressed security for new home warranties in Chapter 223 of the Acts of 1990, which added Subtitle 6, "New Home Warranties," to Title 10 of the Real Property Article. In general, Subtitle 6 requires certain disclosures, *see* §§ 10–602 and 10–603, under pain of criminal sanctions for failure to comply, *see* § 10–609. A builder must disclose in writing to the owner whether or not the builder participates in a new home warranty security plan, and, in either event, certain further disclosures are required. *See* §§ 10–602 and 10–603. A new home warranty security plan must conform to minimum standards set forth in § 10–606. "New home" is a definitional term in Subtitle 6. Section 10–601(i) provides:

"(1) 'New home' means every newly constructed private dwelling unit in the State and the fixtures and structure

that are made a part of a newly constructed private dwelling unit at the time of construction.

(2) 'New home' does not include:

(i) Outbuildings, including detached garages and detached carports, except outbuildings that contain plumbing, electrical, heating, cooling, or ventilation systems serving the new home;

(ii) Driveways;

(iii) Walkways;

(iv) Patios and decks;

(v) Boundary walls;

(vi) Retaining walls not necessary for the structural stability of the new home;

(vii) Landscaping;

(viii) Fences;

(ix) Off-site improvements;

(x) Appurtenant recreational facilities; and

(xi) Other similar items as determined by the Secretary."

Subtitle 6 does not apply to "new home warranties offered, or new home warranty security plans operating in Montgomery County," with certain exceptions not applicable here. § 10–610.

Thus, Subtitle 6 is not applicable to the Andrulises' new home. Further, although the Montgomery County local law and implementing Exec.Reg. 22–86 are applicable to the Andrulises' new home, those local provisions cannot repeal or restrict the operation of Title 2. Consequently, § 10–203(a), the implied warranties provision exclusively relied on by the trial court, remains the governing statute.

In the matter before us the Court of Special Appeals concluded, and Levin urges, that "improvements" as used in § 10–203(a), and as defined in § 10–201(b), should have a scope limited to the reach of "new home" as defined in § 10–601(i). In other words, Levin contends that, by the process of construction, this Court should incorporate the specific exclu-

sions found in § 10–601(i)(2) into the definition of "improvements" under § 10–201(b). Citing decisions of this Court stating rules of statutory construction, including *Hope v. Baltimore County*, 288 Md. 656, 666, 421 A.2d 576, 581 (1980), Levin submits that "since these two statutes pertain to the same general subject matter, the two statutes must be construed together and harmonized to the fullest extent possible." Brief for Appellee at 24.

We start with the plain language of the statute. "Improvements" in § 10–201(b) includes not only the dwelling unit *per se* but also "every ... fixture and structure which is made a part of a newly constructed private dwelling unit at the time of construction." Thus, a reading that attempts to limit § 10–203 implied warranties to the dwelling unit *per se* has no support in the language employed in the statute.

This Court had occasion to address §§ 10–201 and 10–203 in *Starfish Condominium Ass'n v. Yorkridge Serv. Corp.*, 295 Md. 693, 458 A.2d 805 (1983). The condominium, located near the Atlantic Ocean in Ocean City, Maryland, consisted of three garden apartment buildings, each containing three floors with four units on each floor. *Id.* at 696–97, 458 A.2d at 807. The beachfront construction utilized breezeways in lieu of enclosed hallways. The breezeways and the stairways connecting the breezeways of the three floors were part of the condominium common elements. *Id.* at 702, 458 A.2d at 810. One of the alleged breaches of implied warranty related to the stairways. *Id.* at 703, 458 A.2d at 810. We said:

"Each of these alleged defects relates to a 'fixture and structure which is made a part of a newly constructed private dwelling unit,' so that it constitutes an improvement under § 10–201(b). Each is the subject of the warranty provided by § 10–203(a)."

*Id.* . Thus, *Starfish* did not limit the warranty under § 10–203 to the dwelling unit *per se*, or to fixtures or structures immediately attached to the dwelling unit *per se*. Nor did we limit the warranty to fixtures or structures outside the walls of

the dwelling unit that might be necessary for the structural stability of the dwelling unit.

Against all of this background, the 1990 enactment of Subtitle 6 has the opposite effect from that for which Levin contends. In stating a primary definition of "new home" in § 10–601(i)(1), the General Assembly used nearly the identical language employed in 1971 to define "improvements" in Subtitle 2. Then, faced with the breadth of that definition and its literal application in *Starfish*, the General Assembly recognized that, in order to limit the sweep of the primary definition of "new home" in the new statute dealing with security for warranties, it was necessary to state specific exclusions. These specific exclusions are found in subsection (2) of the "new home" definition. There are no specific exclusions in § 10–201(b), and the § 10–601(i)(2) list of exclusions cannot be added to § 10–201(b) by judicial fiat.

All of the items of work done that are involved in this issue and listed above are "a part of" this private dwelling, newly constructed by Levin, that was sold by it to the Andrulises. There is no need for a remand to determine whether the retaining walls are necessary for the structural stability of the dwelling house.

### D

■ The Court of Special Appeals said, and perhaps alternatively held, that "the warranty provisions embodied in the [C]ontract make it evident that the parties intended to exclude the disputed items, except for the garage and the retaining walls necessary for the house's structural stability, from coverage." This apparently refers to the program under the Montgomery County local law, and to the Home Owners Warranty Corporation policy which contained the exclusions quoted above.

For at least two reasons these aspects of the transaction do not abrogate § 10–203 implied warranties in this case. First, the Contract explicitly states that "[n]otwithstanding anything to the contrary, [Levin] shall provide applicable warranties as

required by State ... codes/law regarding the construction of the subject property."

Second, § 10–203(d) provides:

*"Exclusion or modification of implied warranty.*—Neither words in the contract of sale, nor the deed, nor merger of the contract of sale into the deed is effective to exclude or modify any implied warranty. However, if the contract of sale pertains to an improvement then completed, an implied warranty may be excluded or modified wholly or partially by a written instrument, signed by the purchaser, setting forth in detail the warranty to be excluded or modified, the consent of the purchaser to exclusion or modification, and the terms of the new agreement with respect to it."

The attempted exclusion in the Contract does not comply with § 10–203(d). *See Starfish,* 295 Md. at 702, 458 A.2d at 810 (exclusion provision ineffective because of failure to advise of the implied warranties sought to be excluded).

## II

The second issue concerns the measure of damages for breach of the § 10–203 warranties as they apply to a foundation drainage system for the dwelling house itself. The parties agree that the local building code requires that a drainage system be installed on the outside of, and at the base of, the foundation of the dwelling.[4] Its primary purpose is to prevent water infiltration into the dwelling by keeping the water level below that of the foundation.

---

4. Montgomery County has adopted, with amendments, the 1983 Council of American Building Officials (CABO) One and Two Family Dwelling Code. Section R–305.1 of CABO, as adopted by Montgomery County Exec.Reg. 39–86, provides:

"Drains shall be provided around foundations enclosing habitable or usable spaces located below grade and which are subjected to ground water conditions. Drains shall be installed at or below the area to be protected and shall discharge by gravity or mechanical means into an approved drainage system."

Compliance with the local building code was an implied condition of the Contract. *Denice v. Spotswood I. Quinby, Inc.,* 248 Md. 428, 433, 237 A.2d 4, 6 (1968).

The Andrulises' expert, Thomas, had excavated at the northeast and southwest corners of the house during one of the hiatuses in the trial. Based on what he observed, and on what he did not find, Thomas opined that there was no foundation drainage system on the west and north sides of the house. He adhered to his previously expressed opinion that the drainage system, where installed, was not installed properly and was not functioning properly. Thomas explained that over time, perhaps in fifteen to twenty years, hydrostatic pressure would damage the foundation walls, necessitating their repair.

Thomas further opined that the installation of a foundation drainage system after the house had been completed would be very expensive. He said that the work could not be done with a backhoe, but that it would have to be done by hand. Plantings would have to be removed. A swath across the patio in the back of the house and sections of walkway and of driveway would have to be removed. In the rear of the house, excavation would have to be to a depth of twelve or thirteen feet. At one area on the west side, where there is a deep window well near a planter, the contractor would have to tunnel sideways for a short distance to install the drain. In his revised written estimate, Thomas placed the cost of installing a functioning foundation drainage system on all four sides at $55,625.

We quote the trial court's findings on this issue:

"An irrefutable fact is that I accept Mr. Thomas as a highly credible expert and a highly credible witness and while I have not—and while I don't disagree with the estimates he has given as to certain work that needs to be done, that could be done, I just simply do not find it reasonable under the circumstances that that be done.

"But let me say that, in my view of judging witnesses, I accept the truthfulness and credibility of this witness, as well as the evidence that he has produced ... and I am left with the conclusion by a bare preponderance of the evi-

dence—this one is close—but the [Andrulises] have made out a case in this respect.

"By a bare preponderance of the evidence which is their standard of proof, the [Andrulises] have shown that it is more likely than not that on two sides of that house the drainage system was not installed.

"I am not going to elaborate extensively on how the damages testified to by Mr. Thomas of $55,625 are arrived at because I am not going to accept that figure. Instead, I take an alternate view.

" . . . This basement has existed for four-plus years and there is very little evidence of any leaking in that basement, very little.

"The argument is made you should award damages because it will leak eventually. . . . Maybe it will leak eventually and maybe it won't, but we have had some pretty good storms in the last four years.

"I accept to this extent the estimate given by Mr. Thomas of the total value of what it would cost to do it and do it right, $55,625, but I would allow that if we had a leaking basement and we don't have a leaking basement.

"But, ladies and gentlemen, if somebody buys that home at one million-plus dollars . . . those people in that range have a way of asking a lot of questions that have to be answered and going to court suits or having their attorneys do so and I am going to accept one-half of that sum as a diminution in value on this basis: Whether it is leaking or not, those who are inclined to investigate at that level, finding this material that would be available to them, are likely to say in setting the price of this home, 'We will gamble with you 50/50. If it does leak and we have to do the work, it will be $55,625. We want you to come down on your price by half that,' and I foresee in that a diminution in value that is, in my view, more than speculation and, therefore, I am going to allow half that sum on the alternate theory of diminution of value and not replacement cost.

"If we had a leaking basement, I would allow the $55,625; we don't, but we do have a diminution in value. That is how we get it."

In the cross-appeals to the Court of Special Appeals, Levin argued on this foundation drain issue that the Andrulises had failed to offer any evidence of diminution of market value and that, because the circuit court had found that repairs were unreasonable, only nominal damages should be awarded. The Andrulises argued that they were entitled to the full cost of installing the missing foundation drain, and that any doubt as to whether economic waste was involved should be resolved against the contractor.

The Court of Special Appeals held that the trial court had made an error of law in finding that the cost of cure was unreasonable. The intermediate appellate court interpreted that finding to have been based on a legal conclusion that the cost of installing a functioning foundation drainage system could not be awarded if the basement was not leaking. Holding that there was a present breach of warranty, entitling the Andrulises to actual damages, the Court of Special Appeals concluded on this point as follows:

"We are not fact finders, and, thus, cannot, and shall not, determine the amount of damages. We shall remand this issue to the trial court in order that it may calculate the damages either under the cost of repairs standard or the diminution of value standard. Either party may produce additional evidence or rely on the record (in whole or in part) or both."

(Citations omitted).

In its conditional cross-petition for certiorari, Levin asserts that the Court of Special Appeals erred in reversing the trial court's finding that the cost of cure of the breach of warranty relating to the foundation drainage system was unreasonable. Levin emphasizes the trial court's finding that the basement does not leak. The strongest evidence as to the presence of water in the basement is the discoloration, due to dampness, of a number of bricks in the wine cellar. Levin submits that

the instant case is an appropriate one for application of the doctrine of economic waste, objects to the remand, and urges that only nominal damages be allowed on this issue.

The initial petition for certiorari—that filed by the Andrulises—had not submitted any issue directed to the foundation drainage system; their issues for certiorari were limited to the scope of the § 10–203(a) warranties discussed in Part I of this opinion. No answer was filed by the Andrulises to Levin's cross-petition. Even though they did not raise the issue in their petition for certiorari, the Andrulises suggest in their brief as cross-respondents that this Court should direct that the judgment be increased to include the full cost of this corrective work, based on Thomas's estimate.

*Gilbert Constr. Co. v. Gross,* 212 Md. 402, 129 A.2d 518 (1957), discusses economic waste to a limited extent. In that case homebuyers sought damages from the vendor because of defective heating units installed in their new homes. There was no express warranty, and implied warranties had not yet been legislatively created. *Id.* at 406–08, 129 A.2d at 519–20. The plaintiffs were permitted to go to the jury, however, on the theory that the installation of the heating units had not been done in a workmanlike manner. *Id.* at 409, 129 A.2d at 521. Supporting the trial court's instruction to the jury as to the measure of damages, this Court touched upon economic waste:

"We think that the trial judge stated a correct abstract rule of law as to the measure of damages when he instructed the jury in substance that if it found a verdict for the plaintiffs ..., the measure of damages would be the cost of repairing or remedying any defects due to the defendant's failure to install a heating unit in a good and workmanlike manner, if it were reasonable or practicable to correct such defects; but that if it were not reasonable or practicable to do so, then the measure of damages would be the difference between the fair market value of the house with the heating unit as actually installed and the fair market value of the house with the same heating unit installed in a good and workmanlike manner."

*Id.* at 411, 129 A.2d at 522. Judgment for the plaintiffs was reversed because no evidence of the diminution in value had been presented. The only testimony relating to damages addressed the decrease in value due to the defective system, not its improper installation. *Id.* at 411–12, 129 A.2d at 523. Because the plaintiffs had no warranty under which to recover for the defective system, they were not entitled to damages on that basis. Noting that there was no evidence of actual damages due to the improper installation, the Court awarded each plaintiff one cent, as nominal damages, and costs. *Id.* at 412–13, 129 A.2d at 523.

■ Professor Corbin explains the proper measure of damages for a breach by defective construction, with a caveat for the economic waste doctrine:

"[T]he injured party can get a judgment for damages measured by the reasonable cost of reconstruction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste. Sometimes the defects in a structure cannot be physically remedied without tearing down and rebuilding. In many such cases, the structure as it exists, even though it is not exactly in accordance with the contract requirements, is such that it will render substantially all the service that the structure contracted for would have rendered; and reconstruction and completion in accordance with the contract may be possible only at a cost that would be imprudent and unreasonable. The law does not require damages to be measured by a method involving such economic waste."

A. Corbin, *Corbin on Contracts* § 1089, at 485–87 (1964) (footnote omitted). If economic waste would result by repair, the proper measure of damages is "the difference between the market value that the structure contracted for would have had and that of the imperfect structure received by the plaintiff." *Id.* § 1090, at 493.

One of the caveats Corbin places on this rule is that it is the burden of the breaching contractor to prove, "affirmatively and convincingly," that the repairs would result in unreason-

able economic waste; otherwise, the cost of repair should be the measure of damages. *Id.* § 1089, at 488. "Any reasonable doubt as to whether curing defects would cause such economic waste should be resolved against the contractor guilty of the breach. . . ." *Id.* § 1089, at 492.

The Restatement (Second) of Contracts addresses the economic waste doctrine.

"Sometimes, . . . the cost to remedy the defects will be clearly disproportionate to the probable loss in value to the injured party. Damages based on the cost to remedy the defects would then give the injured party a recovery greatly in excess of the loss in value to him and result in a substantial windfall. Such an award will not be made. . . . If an award based on the cost to remedy the defects would clearly be excessive . . ., damages will be based instead on the difference between the market price that the property would have had without the defects and the market price of the property with the defects."

Restatement (Second) of Contracts § 348, cmt. c (1979).

One illustration for the quoted Restatement text is based on the frequently cited case of *Jacob and Youngs v. Kent,* 230 N.Y. 239, 129 N.E. 889 (1921). There, the building contract specified that Reading pipe was to be used in all the plumbing work. After the structure was completed, the homeowner learned that some Cohoes pipe had been installed. 129 N.E. at 890. Because there was no quality difference between the two brands and no difference in the value of the house with some Cohoes, rather than exclusively Reading, pipe, the court awarded only nominal damages, finding that the cost of repair was in excess of any actual damages and would result in economic waste. *Id.* at 891–92. Another Restatement illustration concludes that cost of repair damages of $30,000 on a $100,000 contract should be awarded when a contractor laid a defective foundation, even though the diminution in value caused by the defect was only $20,000. The defect was said to pose a "dangerous condition."

A discussion in 13 Am.Jur.2d *Building and Construction Contracts* § 79 (1964) explains that the economic waste doctrine applies only when the cost of repairs would be "grossly disproportionate" to the increased value of the structure with the repairs. *Id.* § 79, at 79.

There are decisions, cited by the Court of Special Appeals, which sustained damages measured by the cost of correcting defective construction work against an argument that the cost constituted economic waste. These cases have given some weight to the percentage which the damages awarded bore to the total contract price. For example, in *Rhode Island Turnpike & Bridge Auth. v. Bethlehem Steel Corp.*, 119 R.I. 141, 379 A.2d 344 (1977), *vacated on other grounds*, 415 A.2d 1295 (1980), the contractor had used poor quality paint on parts of a bridge. Repainting the bridge after construction was considerably more costly than had proper materials been used originally. 379 A.2d at 356. The cost of correction equaled twenty-five percent of the contract price, but the court was not convinced that economic waste resulted. *Id.; see also First Nat'l Bank v. Cann*, 503 F.Supp. 419, 441 (N.D.Ohio 1980) (upholding an award of eleven percent of the contract price as not constituting economic waste), *aff'd*, 669 F.2d 415 (6th Cir.1982); *Kenney v. Medlin Constr. & Realty Co.*, 68 N.C.App. 339, 315 S.E.2d 311, 314–15 (upholding repair costs of $35,000 on a $51,000 contract), *reviewed denied*, 312 N.C. 83, 321 S.E.2d 896 (1984).

Here, the Court of Special Appeals noted that the cost of correcting the drainage system was 4.35% of the contract price. This comparison supports the reasonableness of correcting the defect and lends support to that prong of the remand ordered by the Court of Special Appeals that would permit increasing the judgment.

Illustrating economic waste is *Correa v. Maggiore*, 196 N.J.Super. 273, 482 A.2d 192 (1984). Using terms such as "shock the conscience," "excessive," and "miscarriage of justice," the court reversed an award of $33,000 for a breach of a $25,000 sale of realty contract. 482 A.2d at 197. The house

was purchased for $25,000 but was found to have a $33,000 defect—it leaned to one side. *Id.* at 194. In reversing the cost of repair award the court explained:

> "The economic waste doctrine has its origin in compelling considerations of equity and justice, and is justified on the ground that although damages measured by diminution in value may not be sufficient to place the injured party in the same physical position as would proper performance of the contract, his pecuniary status will be substantially as good."

*Id.* at 198. The court's decision was buttressed by the fact that if the repairs necessary to correct the defect were performed, the plaintiff-buyer would receive a house far better than the house for which she had contracted—the house would be totally refurbished. *Id.*

■ From all of the foregoing we draw the following conclusions. First, economic waste is a limitation on the ordinary rule of contract damages which seeks to vindicate the promisee's expectation interest. The primary measure of damages in these cases remains that stated in *Ray v. Eurice,* 201 Md. 115, 129, 93 A.2d 272, 279 (1952) (quoting *Carrig v. Gilbert–Varker Corp.,* 314 Mass. 351, 50 N.E.2d 59, 62–63 (1943)):

> " 'The owner was entitled to be put in the same position that he would have been in if the contractor had performed its contract.... We think the proper measure of damages was the cost in excess of the contract price that would be incurred by the owner in having the houses built....' "

■ Second, the concept of waste represents a substantial degree of disproportionality, and that disproportionality must be determined in relation to something else. At the stage of analysis of a potential limitation on cost of cure, the concern is no longer with whether the cost of the work is reasonable in relation to what others would charge to do the same work in a comparable fashion. In any event, in this case the trial court accepted Thomas's estimate of $55,625. Here, where we deal with improvements to real estate, in order to demonstrate that the cost of cure mounts up to economic waste, considerable weight must be given to any difference between the value of

the property after the corrective work is done with the value of the property absent the corrective work. That difference is then compared to the cost of cure. These before and after values of the property are figures that we do not know, and therein lies the error committed by the trial court.

For example, if the cost of the corrective work increases the value of the Andrulises' residence dollar for dollar, waste would not be an issue. At the other end of the spectrum, it is contra intuitive that the corrective work would fail to increase the value of the Andrulises' property to some extent. Phrased another way, it is difficult to believe that an improved property, comparable in all other respects to that of the Andrulises except for the lack of a functioning foundation drainage system, would have the same value as the Andrulises' property without such a system.

The trial court sought to supply the missing evidence of values by substituting the reaction of a hypothetical buyer, armed in negotiations with the knowledge that the foundation drainage system is defective. That substitution constituted speculation. Nor should we assume that the Contract price represents the value of the premises, as warranted, and that the Contract price, less the cost of a drainage system as estimated by Thomas, represents the value of the premises without a drainage system. It may be that the value of the Andrulises' house, without a drainage system, is depressed by more than the cost of the corrective work. It may be that buyers of this class of property in Montgomery County would prefer to purchase a code-complying house, rather than to endure the aggravation of having the corrective work done. There is no evidence on these points.

We turn then to the propriety of the remand ordered by the Court of Special Appeals. Here, the trial court on its own initiative injected economic waste into the case. Neither party produced evidence directed to value before and after the corrective work, nor argued in the trial court for that measure of damages.

The authorities reviewed above agree that the burden to show that the cost of correction constitutes economic waste is on the party breaching the contract. *Stangl v. Todd*, 554 P.2d 1316 (Utah 1976), applies this burden of proof rule. The contractor agreed to build a multiple-unit dwelling for a specified price. After beginning the project, the contractor, without legal excuse, refused to complete at the contract price. *Id.* at 1317. The owners obtained bids from other contractors to complete the work. All of the bids were significantly higher than the original contract price, and the owners were forced to abandon the project and destroy the minimal work performed by the defendant. *Id.* at 1318. The trial court awarded the owners the cost they would have incurred to have the project completed. The contractor argued that completion of the project would constitute economic waste so that the owners were entitled to recover only the difference between the market value of the structure if completed and the market value of the work performed. *Id.* at 1320. In refusing to accept the contractor's argument, the Utah court held that the breaching contractor bears the burden of proving, "affirmatively and convincingly," that completion would result in economic waste and, further, that the breaching contractor in this case failed to demonstrate unreasonable economic waste by its failure to present evidence necessary to take the market value approach. *Id.; see also Shell v. Schmidt*, 164 Cal.App.2d 350, 330 P.2d 817, 827 (1958) (holding that the breaching contractor has the burden "to affirmatively and convincingly prove that economic waste would result [and that] a substantial part of what has been done must be undone"), *cert. denied*, 359 U.S. 959, 79 S.Ct. 799, 3 L.Ed.2d 766 (1959).

■ We hold that the burden of proving economic waste is on the party that breached the contract and that invokes the doctrine in an effort to limit expectation interest damages. This holding is consistent with the limitation on expectation interest damages resulting from the doctrine of avoidable consequences, under which the burden is on the breaching party. *See Sergeant Co. v. Pickett*, 285 Md. 186, 203, 401 A.2d

651, 660 (1979); *M & R Contractors & Builders v. Michael,* 215 Md. 340, 356, 138 A.2d 350, 359 (1958).

■ The following factors, distilled from the foregoing analysis, bear on the appropriateness of the remand ordered by the Court of Special Appeals:

- That the foundation drainage system is in breach of warranty is unchallenged on this appeal.

- The trial court accepted that the cost of a foundation drainage system that would conform to the warranty was $55,625, of which only $27,813 was included in the judgment.

- The cost of conforming the system is the ordinary measure of damages; a measure of damages based on diminution in value, because the cost of conforming to warranty constitutes economic waste, is the exception to the rule.

- The Court of Special Appeals was in error in viewing the two measures of damages as alternative, in the sense of being freely interchangeable.

- There is no evidence comparing values with and without cure, and no evidence of economic waste.

- The burden of producing evidence tending to prove economic waste was on Levin.

- Levin has urged that there be no remand, arguing that remand should not be permitted for the production of evidence that should have been produced at trial.

- In ordering a remand, the Court of Special Appeals did not recognize that Levin would have the burden of proving economic waste.

Based on all of these factors, we conclude that the Court of Special Appeals erred in ordering a remand. That court's judgment will be modified to delete the remand. The Court of Special Appeals, however, correctly vacated that portion of the circuit court judgment that fixed, and thereby limited, the damages on the foundation drainage system at $27,813. "In reversing or modifying a judgment in whole or in part, the Court may enter an appropriate judgment directly or may

order the lower court to do so." Maryland Rule 8–604(e). Here, we direct that that portion of the principal amount of judgment of the Circuit Court for Montgomery County relating to the dwelling's foundation drainage system be entered for $55,625, an increase of $27,812. Post judgment interest on that additional $27,812 will run only from the date of the mandate of this Court.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THE COURT OF SPECIAL APPEALS FOR THE ENTRY OF A JUDGMENT AFFIRMING IN PART AND REVERSING IN PART THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY, CONSISTENT WITH THE OPINION OF THIS COURT, AND REMANDING TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR MODIFICATION, AS DIRECTED IN THIS OPINION, OF THE JUDGMENT ENTERED BY THE CIRCUIT COURT FOR MONTGOMERY COUNTY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY LEVIN CONSTRUCTION CORPORATION, d/b/a THE LEVIN COMPANIES.