OPINION OF THE COURT
FUENTES, Circuit Judge:
This case arises out of two contracts: a contract for the construction of four barges by HBC Barges, LLC (“HBC”) for Cashman Equipment Corporation (“Cash-man”), and a performance bond agreement between United States Fire Insurance Company (“U.S. Fire”) and HBC, which made U.S. Fire jointly and severally liable to Cashman for the performance of the contract. HBC failed to comply with aspects of the construction contract. Cash-man filed suit against HBC and U.S. Fire and was awarded liquidated damages and, following a bench trial before the Magistrate Judge, non-liquidated damages. These cross-appeals followed. We will affirm in part and reverse in part.
I.
On August 23, 2002, Cashman, a Massachusetts corporation, entered into a contract (the “Contract”) with HBC, a Pennsylvania company, under which HBC would construct four barges for Cashman for a total contract price of $1,128,604. In light of the fact that steel corrodes when exposed to salt water, the Contract required HBC to “[p]aint entire Interior and Exterior with two coats of epoxy 12 to 14 mils DFT.”[1] (J.A. 716.) The Contract also provided that HBC would incur liquidated damages if it failed to deliver the barges to Cashman by December 30, 2002. Finally, the Contract expressly stated that it was to be construed under Massachusetts law.
HBC and U.S. Fire entered into a performance bond agreement (the “Bond Agreement”) in connection with the Contract. The Bond Agreement provided that HBC and U.S. Fire “jointly and severally, bind themselves ... to ... [Cashman] for the performance of the Construction Contract, which is incorporated herein by reference.” (J.A. 718.) U.S. Fire’s exposure under the Bond Agreement was capped at $1,128,604. Under the Bond Agreement, in the event of an uncured default by HBC, U.S. Fire was required to perform and complete the Contract; if U.S. Fire failed to do so, the Bond Agreement authorized Cashman to “enforce any remedy available to [it].” (J.A. 718.)
HBC’s performance under the Contract was deficient in two respects. First, the barges were not delivered on time, triggering the Contract’s liquidated damages clause. Second, HBC did not comply with aspects of the Contract’s painting specifications — the interior coating of the barges received only one coat averaging approximately five to seven mils in thickness, and the coating was not applied evenly, with some areas of the barges’ interiors having had no epoxy applied at all. Within a year *291 of the belated delivery of the barges, Cash-man informed HBC of peeling epoxy and other “paint issues” on all four barges, (J.A. 700), and after HBC failed to take corrective actions, Cashman issued a notice to HBC and U.S. Fire declaring HBC’s default on the Contract. U.S. Fire failed to step in to cure HBC’s default, and Cashman filed suit against HBC and U.S. Fire.[2]
After discovery, Cashman and U.S. Fire filed cross-motions for summary judgment. The District Court, addressing the choice of law issues in the case, held that the Contract was governed by Massachusetts law on account of its choice of law clause, and that the Bond Agreement between HBC and U.S. Fire was governed by the law of Pennsylvania, the state with the closest ties to that Agreement. The District Court granted Cashman’s motion for partial summary judgment as to liquidated damages based upon HBC’s late delivery of the barges, finding HBC and U.S. Fire jointly and severally liable for $100,000. The Court further held that Cashman was owed prejudgment interest on its claim for liquidated damages, which the Court calculated at the twelve percent rate supplied by Massachusetts law, awarding $47,733 in prejudgment interest.[3]
Following a bench trial on non-liquidated damages, the Magistrate Judge found in Cashman’s favor and entered judgment on the remaining portion of the bond amount. The Magistrate Judge found that HBC had not applied sufficient epoxy and that HBC’s poor workmanship had caused the coating system to break down; as a consequence of HBC’s breach, the Magistrate Judge found, the useful service lives of the vessels had been diminished by at least ten years. The Magistrate Judge concluded that the cost to repair these damages was well in excess of the $1,028,604 remaining on the face amount of the bond and awarded the remainder of the bond amount in non-liquidated damages, rejecting U.S. Fire’s argument that this sum was so disproportionate to the lost value as to constitute economic waste. Applying the District Court’s holding that Pennsylvania law governed Cashman’s claim under the Bond Agreement, the Magistrate Judge applied Pennsylvania’s six percent interest rate, awarding $175,003 in prejudgment interest.
II.[4]
A.
We address the choice of law questions at the outset. U.S. Fire contends that the District Court erred in applying Massachusetts law to calculate prejudgment interest for liquidated damages, and Cashman challenges the determination that Pennsylvania law applied to its claim arising under the Bond Agreement. We *292 agree with Cashman that Massachusetts law applies to the entirety of its claims against U.S. Fire.
Under the doctrine established by Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), “a federal court sitting in diversity must apply the law of the forum state to questions that are ‘substantive’ but must use federal rules to govern ‘procedural’ matters.” Yohannon v. Keene Corp., 924 F.2d 1255, 1265 (3d Cir.1991). Since a state’s conflict of law rules are substantive, a federal court exercising diversity jurisdiction must apply the conflict of law rules of the state in which it sits to determine which state’s laws govern each of the issues in a case. See Klaxon Co. v. Stentor Elec. Mfg., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).
The District Court correctly held that the choice of law clause in the Cashman-HBC Contract is enforceable under Pennsylvania law. See Gay v. CreditInform, 511 F.3d 369, 389 (3d Cir.2007). More problematic is the District Court’s holding that Cashman’s claims arising under the Bond Agreement are subject to Pennsylvania law. In reaching this conclusion, the District Court looked to the factors Pennsylvania courts consider in making choice of law determinations in the absence of an effective choice by the parties. However, in rendering this determination, the District Court overlooked the impact of the Contract’s choice of law provision upon the interpretation of the Bond Agreement.
Although the Pennsylvania Supreme Court has not addressed the impact of a choice of law clause in a principal contract upon a suretyship contract containing no choice of law clause, the Restatement (Second) of Conflict of Laws contains a provision directly on point. It provides:
The validity of a contract of suretyship and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the law governing the principal obligation which the contract of suretyship was intended to secure, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.
Restatement (Second) Conflict of Laws § 194 (emphasis added).
At least one federal court applying Pennsylvania law has relied upon this provision of the Restatement in determining which state’s law governs a suretyship agreement with no choice of law clause, see CBS, Inc. v. Film Corp. of America, 545 F.Supp. 1382, 1386 (E.D.Pa.1982), as have courts in numerous other jurisdictions.[5] While Pennsylvania’s Supreme Court has yet to weigh in on this issue, the logic of the Restatement’s rule is persuasive, and we predict that when the Pennsylvania Supreme Court takes up the matter, it will follow the majority of jurisdictions and adopt the Restatement rule. First, as the comments to Section 194 explain, “[i]n the *293 nature of things, the two contracts will usually be closely related and have many common elements,” Restatement (Second) Conflict of Laws § 194, cmt. b, which strongly suggests that the two contracts should be interpreted under the same state’s laws. Moreover, “[s]uch a conclusion is likewise dictated by considerations of practicality and convenience. In addition, the contract of suretyship can often be considered accessory, or subsidiary, to the principal obligation,” id., further indicating the logic behind the Restatement rule.
In arguing that Pennsylvania courts would not endorse the Restatement rule, U.S. Fire draws our attention to Pennsylvania cases setting forth the unremarkable proposition that “the obligation of a bond cannot be extended beyond the plain import of the words used.” Peter J. Mascaro Co. v. Milonas, 401 Pa. 632, 166 A.2d 15, 17 (1960) (citation omitted). Such a proposition would be relevant if the Bond Agreement itself contained a choice of law clause. However, the Restatement’s rule speaks to circumstances where there is no “plain import of the words used,” id., because the words of the suretyship agreement are silent as to the choice of law. See Restatement (Second) Conflict of Laws § 194 (setting forth the rule to apply “in the absence of an effective choice of law by the parties”). The Restatement rule is thus distinguishable from the Pennsylvania cases cited by U.S. Fire, which do not bear directly upon the question before us.
In the absence of any decision by the Pennsylvania Supreme Court to the contrary, and in light of the logic of the Restatement rule, we predict that the Pennsylvania Supreme Court would embrace the Restatement on this point. Applying Section 194 to the Bond Agreement, it is apparent that Massachusetts law should govern the interpretation of the Bond Agreement, including “the rights created thereby.” See id.[6] The Bond Agreement is silent as to which state’s law should apply to it, which means that “the law governing the principal obligation which the contract of suretyship was intended to secure” likewise governs the Bond Agreement. The Massachusetts prejudgment interest rate is twelve percent, see Peabody N.E., Inc. v. Town of Marshfield, 426 Mass. 436, 445, 689 N.E.2d 774 (Mass.1998), and the Magistrate Judge’s application of Pennsylvania’s six percent rate was thus in error.
U.S. Fire’s final argument to the contrary is unavailing. U.S. Fire draws our attention to our decision in Yohannon v. Keene Corp., wherein we addressed the choice of law implications of Pennsylvania Rule of Civil Procedure 238, which provides for delay damages in certain tort actions. In assessing whether Pennsylvania courts would enforce Rule 238 or another jurisdiction’s delay damages rule when faced with a choice of law decision, *294 we predicted in Yohannon that Pennsylvania’s Supreme Court would hold that Pennsylvania courts must always enforce Rule 238, rather than another jurisdiction’s delay damages rule. See Yohannon, 924 F.2d at 1267. Yohannon’s holding rested on the unique fact that the Pennsylvania Supreme Court has consistently — and controversially [7] — “insisted that the imposition of delay damages under Rule 238 is a matter of procedure.” Id. at 1266 (citations omitted).
U.S. Fire’s reliance on Yohannon in this matter is misplaced, on account of the simple fact that Rule 238 is a tort rule that has no application to contract cases such as this one. The Pennsylvania Supreme Court recently held in no uncertain terms that Rule 238 applies only to certain tort actions, expressly stating that “Rule 238 delay damages are not available in a breach of contract action.” Touloumes v. E.S.C. Inc., 587 Pa. 287, 298, 899 A.2d 343 (Pa.2006). The Court made clear that a separate category of prejudgment interest, unrelated to Rule 238, applies in contract-based claims:
[PJaramount is the fact that in a breach of contract action, pre-judgment interest is the appropriate vehicle to secure monies for the delay of relief. Thus, the purpose for which Rule 238 was promulgated was already recognized by the legal right to pre-judgment interest in contract actions.
Id at 297-98 (citations omitted). Unlike the Pennsylvania Supreme Court’s “steadfast” insistence that Rule 238 is a matter of procedure, not substance, Yohannon, 924 F.2d at 1266, there is nothing to suggest that the distinct “legal right to prejudgment interest in contract actions” would be characterized as a matter of procedural law. Touloumes, 587 Pa. at 298.
In sum, we conclude that Cashman’s entitlement to prejudgment interest under the Bond Agreement is governed by Massachusetts law. We will reverse the lower courts’ decisions to the contrary and remand in order for the District Court to correctly calculate prejudgment interest at the twelve percent rate supplied by Massachusetts law.
B.
We next address U.S. Fire’s contention that the Magistrate Judge erred in concluding that it would not constitute economic waste to award non-liquidated damages to Cashman in the amount of $1,028,604. U.S. Fire argues that the Magistrate Judge’s non-liquidated damages award is inconsistent with the economic waste doctrine because it awards an amount of damages equal to the original purchase price of the barges, when there is evidence suggesting that the barges have actually increased in value, notwithstanding the painting defects. We do not agree.
Under Massachusetts law,[8] “[t]he basic principle of contract damages is that the *295 aggrieved party should be put in as good a position as if the other party had fully performed.” Quinn Bros., Inc. v. Wecker, 414 Mass. 815, 817, 611 N.E.2d 234 (Mass. 1993) (citation omitted). In the case of construction contracts in which the contractor’s performance is incomplete or defective, “damages generally will be based on the market price of completing or correcting the performance.” Id. (internal quotations and citations omitted). The comments to Section 348 of the Restatement (Second) of Contracts explain the rationale behind permitting the non-breaching party to prove damages through demonstrating the cost of repairing the breaching party’s defective work:
Sometimes, especially if the performance is defective as distinguished from incomplete, it may not be possible to prove the loss in value to the injured party with reasonable certainty. In that case he can usually recover damages based on the cost to remedy the defects. Even if this gives him a recovery somewhat in excess of the loss in value to him, it is better that he receive a small windfall than that he be undercompen-sated by being limited to the resulting diminution in the market price of his property.
Restatement (Second) of Contracts § 348, cmt. c.
“Sometimes, however, such a large part of the cost to remedy the defects consists of the cost to undo what has been improperly done that the cost to remedy the defects will be clearly disproportionate to the probable loss in value to the injured party.” Id. As the Restatement explains, a party suing for breach of a construction contract may be awarded damages based upon the cost to repair the defective work, unless such repairs would lead to unreasonable economic waste:
If a breach results in defective or unfinished construction and the loss in value to the injured party is not proved with sufficient certainty, he may recover damages based on[:]
(a) the diminution in the market price of the property caused by the breach, or
(b) the reasonable cost of completing performance or of remedying the defects if that cost is not clearly disproportionate to the probable loss in value to him.
Id. at § 348(2).
The Supreme Judicial Court of Massachusetts has endorsed the economic waste doctrine. See, e.g., Ficara v. Belleau, 331 Mass. 80, 81, 117 N.E.2d 287 (Mass.1954). That court has not, however, expressly weighed in on a question implicated by U.S. Fire’s appeal — namely, who bears the burden of proof as to the proportionality between the cost of repairs and the difference in value between the work constructed and the work contracted for. The vast majority of authorities that have considered the question, however, concur with Professor Corbin that “[without question, the contract breaker should pay the cost of construction and completion in accordance with the contract unless the contractor proves affirmatively and convincingly that such construction and completion would involve an unreasonable economic waste.” 11 Corbin on Contracts § 60.1 (2005) (emphasis added).[9]
*296 We predict that the Supreme Judicial Court of Massachusetts would endorse this rule if the question presented itself, because the rule is consistent with that state’s laws on contract damages and burdens of proof. Under Massachusetts law, the “basic principle of contract damages is that the aggrieved party should be put in as good a position as if the other party had fully performed,” which in construction contract cases means that damages are “based on the market price of completing or correcting the performance.” Quinn Bros., 414 Mass. at 817. It is the breaching contractor who stands to benefit from a deviation from this general principle under the economic waste doctrine. Cf. Andrulis v. Levin Const. Corp., 331 Md. 354, 628 A.2d 197, 208 (1993); P.G. Lake, Inc. v. Sheffield, 438 S.W.2d 952, 956 (Tex.Civ. App.1969) (“[t]he minimization of damages is a defensive matter,” and “[i]f the defendant desires to avail himself of such defense, the burden rests upon him to raise such issue by pleadings and proof’). The Supreme Judicial Court of Massachusetts has in no way suggested that the rule requiring the party asserting an affirmative defense to bear the “burden of establishing the facts necessary to support it,” Carpenter v. Carpenter, 73 Mass.App.Ct. 732, 901 N.E.2d 694, 699 (2009), would operate differently in the economic waste context. We conclude that the burden of proving that the cost of curing a construction defect is disproportionate to the probable loss in value rests with the contract breaker.
We further conclude that the Magistrate Judge’s determination that U.S. Fire failed to sustain its burden of proof as to disproportionality was not in error. The Magistrate Judge’s finding that HBC breached the terms of the Contract’s painting specifications, and that the resultant deterioration of the barges has caused injury to Cashman, are amply supported by the record. See Giles, 571 F.3d at 322. The evidence credited by the Magistrate Judge, particularly the testimony of Dr. Stoltz, was more than sufficient to show that the paint was applied at a lesser thickness than called for and in an un-workmanlike manner, and that the deterioration that resulted from HBC’s deficient work decreased the useful lives of the bai-ges by at least ten years.[10] There was, in addition, ample evidence in the record of “the market price of completing or correcting the performance” in order to remedy HBC’s deficient construction. Quinn Bros., 414 Mass, at 817 (citation omitted). The parties presented three experts’ estimates of the cost to cure, which ranged from $1,979,992 at the low end to $3,941,234 at the upper end. As the Magistrate Judge concluded, “[t]he salient point is that all of these estimates are significantly greater than the $1,028,604.00 available face amount of the Bond which is the upward limit of U.S. Fire’s liability.” (J.A. 52.)
With Cashman having shown that HBC failed to correctly perform under the Contract and having adduced evidence of the price of correcting HBC’s deficient performance, see Quinn Bros., 414 Mass. at 817, the burden shifted to U.S. Fire to “prove[ ] affirmatively and convincingly that such construction and completion would involve an unreasonable economic waste.” 11 Corbin on Contracts § 60.1. One court has lucidly set forth a defen *297 dant’s burden of proof in the following terms:
[OJnce [the plaintiff] presented sufficient proof ... on the cost-of-repairs measure, the burden shifted to [the defendant] to produce evidence showing (a) either that repairing the1 defects was unreasonable because it would have involved more destruction of quality workmanship than would have been warranted considering the value likely to be added to the [property] by making the repairs, or (b) that the repair costs would have been disproportionate to the probable increase in value to [plaintiff] resulting from proper construction, so that difference in value would have been the proper measure of damages. Either approach would have required proof regarding the value of the [property] as defectively constructed and its value if constructed without defect as the contract contemplated.
Pennington, 929 S.W.2d at 175 (emphasis added); see also Andrulis, 628 A.2d at 207.
The only evidence in the record concerning the value of the barges is the reports and deposition testimony of Mr. Collyer, a marine surveyor. Collyer first inspected the barges upon their delivery in 2003 and early 2004, and he estimated their collective market value at that time to be $1,650,000. Collyer subsequently appraised three of the barges in March 2006 — well after Cashman had informed HBC and U.S. Fire that the barges’ coating systems were failing' — and found, with little mention of the painting failures and the deterioration other examiners observed, that those three barges had actually increased in value by $25,000 each. Relying entirely upon Collyer’s valuations, U.S. Fire argues that Cashman has suffered no damages because the barges are presently worth more than Cashman paid for them, and that requiring U.S. Fire to pay the cost of repairs would therefore amount to economic waste.
The Magistrate Judge did not find Col-lyer’s valuations credible, and we cannot say that this determination was clearly erroneous. The Magistrate Judge explained in clear terms that he found Col-lyer’s appraisals to be internally inconsistent, and inconsistent with other evidence he had credited, and that Collyer’s opinions were therefore entitled to “only minimal weight.” (J.A. 30.) Specifically, the Magistrate Judge noted that within the same appraisal of a vessel, Collyer would identify “major paint failures” in a barge, but at the same time would describe the barge as having “good coatings.” (J.A. 30.) With regard to inconsistencies between Collyer’s appraisals and other evidence, the Magistrate Judge found that Collyer gave short shrift to the state and impact of the deterioration, particularly in light of Dr. Stoltz’s testimony (which the Magistrate Judge credited) concerning the impact of the failed coating system on the life span of the barges. U.S. Fire’s own expert witness, Dr. Senkowski, took note of these same inconsistencies and “questioned] the credibility of Mr. Collyer as a competent coatings inspector.” (J.A. 30.) Our review of the Magistrate Judge’s factual findings is for clear error. We cannot say that the Magistrate Judge’s rejection of Collyer’s valuations was “completely devoid of minimum evidentiary support displaying some hue of credibility.” Giles, 571 F.3d at 322. As the finder of fact, the Magistrate Judge was within his right to reject as unpersuasive Collyer’s evaluations, which were internally inconsistent and inconsistent with more credible evidence concerning the deterioration of the barges.
Nor was the Magistrate Judge obligated to accept Collyer’s appraisals simply because there was no other evidence as to *298 the value of the barges. Indeed, even if Collyer’s opinions had not been contradicted by other evidence in the record, the Magistrate Judge would have been within his right not to credit evidence he found unpersuasive. See United States v. Saka, 339 F.2d 541, 543 (3d Cir.1964); see also, e.g., United States v. Sandoval-Mendoza, 472 F.3d 645, 649 (9th Cir.2006) (“Uncon-tradicted testimony is not necessarily undisputed evidence.”); Aron v. United States, 291 F.3d 708, 717 (11th Cir.2002). The Magistrate Judge gave a rational explanation for discrediting Collyer’s conclusions, and we certainly cannot characterize his fact finding as clearly erroneous. In short, U.S. Fire had the burden to prove affirmatively and convincingly that the cost of repairs would amount to economic waste, and the only evidence as to valuation was legitimately discredited by the Magistrate Judge. We will affirm the award of non-liquidated damages.[11]
III.
For the foregoing reasons, we affirm the District Court’s award of liquidated and non-liquidated damages. We vacate the award of prejudgment interest and remand for further proceedings consistent with this opinion.

. A ''mil” is a measurement equal to one-thousandth of an inch, and "DFT” stands for "dry film thickness.”

. HBC filed for bankruptcy, and the District Court held that Cashman could only proceed for damages against U.S. Fire.

. In its cross-motion for summary judgment on non-liquidated damages, U.S. Fire conceded that HBC had breached the terms of the Contract's painting provision, but argued that Cashman had failed to prove that it had sustained damages. The District Court rejected this argument, holding that factual disputes precluded the entry of summary judgment in U.S. Fire’s favor.

.The District Court had jurisdiction pursuant to 28 U.S.C. § 1332, and we have jurisdiction pursuant to 28 U.S.C. § 1291. We review the Magistrate Judge's factual findings for clear error. See Giles v. Kearney, 571 F.3d 318, 322 (3d Cir.2009). We have plenary review over the District Court's and Magistrate Judge's application of the law to the facts. See Holmes v. Millcreek Tp. School Dist., 205 F.3d 583, 589 (3d Cir.2000).

. See, e.g., American State Bank v. U.S. Fidelity & Guaranty Co., 331 F.2d 479, 483 (7th Cir.1964); Socony-Vacuum Oil Co. v. Continental Cas. Co., 219 F.2d 645, 647 (2d Cir.1955); In re Commercial Money Center, Inc., Equipment Lease Litigation, 603 F.Supp.2d 1095, 1104 n. 8 (N.D.Ohio 2009); Ermer v. Case Corp., No. 01-338, 2002 WL 1796438, at *2 (D.Neb. Aug.05, 2002); Marshall Contractors, Inc. v. Peerless Ins. Co., 827 F.Supp. 91, 94 (D.R.I.1993); In re Technology for Energy Corp., 88 B.R. 182, 186 (E.D.Tenn.1988); Phoenix Arbor Plaza, Ltd. v. Dauderman, 163 Ariz. 27, 785 P.2d 1215, 1217 (1989); Johnson v. Ronamy Consumer Credit Cotp., 515 A.2d 682, 687 (Del. 1986); Philip Carey Co. v. Maryland Casualty Co., 201 Iowa 1063, 206 N.W. 808, 811 (Iowa 1926).

. The Restatement rule recognizes that the law governing the principal obligation may not apply to the suretyship agreement if “with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties.” Restatement (Second) Conflict of Laws § 194. While this clause might seem, on first blush, to call for an assessment of each state's connections to the parties and issues in the case, the comments to the Restatement make clear that such a determination is unnecessary under the circumstances presented in this appeal. "A sufficient relationship to justify application of the law governing the principal obligation ... exist[s] if the state whose local law governs the [principal] obligation was ... [either] the state where the [third-party beneficiary] ... relied upon the surety’s promise” or the "state of domicil” of either the beneficiary (Cashman) or the surety (U.S. Fire). Id.., cmt. c. Both of these conditions are clearly satisfied here.

. In Yohannon, we noted that the Pennsylvania Supreme Court's designation of Rule 238 as procedural has been the subject of “strong dissents and concurrences arguing that Rule 238 is not authorized by Article 5, § 10 of the Pennsylvania Constitution because it affects the substantive law of damages." Yohannon, 924 F.2d at 1266.

. As we have explained, Massachusetts law governs Cashman’s claim against U.S. Fire arising under the Bond Agreement. See Restatement (Second) Conflict of Laws § 194. While the Magistrate Judge assessed Cash-man's claim for non-liquidated damages under Pennsylvania law, the high courts of both Massachusetts and Pennsylvania have endorsed the economic waste doctrine, and there is no meaningful difference between the two jurisdictions' laws on this point. The Magistrate Judge's determination may thus be upheld, notwithstanding the erroneous application of Pennsylvania law.

. See, e.g., John Thurmond & Associates, Inc. v. Kennedy, 284 Ga. 469, 471, 668 S.E.2d 666 (Ga.2008); Panorama Village v. Golden Rule Roofing, 102 Wash.App. 422, 10 P.3d 417, 422 (2000); Pennington v. Rhodes, 929 S.W.2d 169, 175-76 (Ark.1996); Andrulis v. Levin Const. Corp., 331 Md. 354, 628 A.2d 197, 208 (1993); Moss v. Speck, 209 Neb. 46, 48-49, 306 N.W.2d 156 (Neb.1981); Stangl v. Todd, 554 P.2d 1316, 1320 (Utah 1976); P.G. Lake, *296 Inc. v. Sheffield, 438 S.W.2d 952, 956 (Tex. Civ.App.1969); Shell v. Schmidt, 164 Cal.App.2d 350, 330 P.2d 817, 823 (1958).

. Indeed, even Dr. Senkowski, U.S. Fire's expert, conceded that fifty-eight percent of the interior coating of the barges had “failed to the point where they no longer are protecting the steel surface.” (j.A. 325.)

. We are unconvinced by U.S. Fire’s contention that in awarding liquidated damages, the District Court overlooked the fact that HBC and Cashman entered into a second contract which functioned as an accord and satisfaction that discharged FIBC's liability for liquidated damages under the original construction Contract. The only evidence of this second contract are a few sentences in the affidavit of HBC's former CEO. Under the best evidence rule, this statement was inadmissible, and it thus does not undermine the District Court's liquidated damage award. See Fed.R.Evid. 1002 (‘‘[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required....").