[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff home buyers have brought this action against the defendant, Madison Enterprises of Connecticut, Inc. (Madison), claiming damages in connection with the construction by the defendant developer of a single family home that the plaintiffs purchased from Madison on property known as Lot No. 1, CT Page 5816 Lindsey Lane, in the town of Willington. The plaintiffs' complaint is in four counts which assert claims of liability based respectively on breach of contract, breach of the express and implied warranties under sections 47-117 and 47-118 of the New Home Warranties Act, and negligence.
After the commencement of this action by the plaintiffs, Madison filed a two count third party complaint for indemnification against its framing contractor, Freestyle Builders, Inc. (Freestyle), which states in the first count that Freestyle "was exclusively responsible for and exclusively in control of the installation of the pre-made trusses" in the Mitchell residence based on the theory of active-passive negligence, and which alleges in the second count that the third party defendant was liable for indemnification based on an oral agreement between Freestyle and Madison. Freestyle has asserted three special defenses to the builder's claims as follows, first, that its work was completed and accepted, second, that it cannot be held liable under the terms of the Bankruptcy Court's order of relief from its stay of all state court proceedings which was limited in this case to "insurance proceeds only", and third, that Madison's claim is barred by § 52-572k of the General Statutes which prohibits hold harmless clauses in building construction contracts as a matter of public policy.
The underlying facts are essentially undisputed and may be stated as follows, based upon the admissions made by Madison in its answer to the complaint, the court's review of the exhibits, and the testimony given by the named plaintiff, Paul F. Mitchell, in support of his factual claims to the extent that it was not contradicted, as well as the testimony of Michael Morton, president of Madison, who was the principal fact witness offered by the defendant in the course of the trial.
On June 9, 1989, the plaintiffs and Madison entered into a bond for deed for the sale of the property at a base price of $205,000.00 exclusive of extras, and provided that the closing was to take place "exactly" on or before July 19, 1989, because time was of the essence, that no portion of the balance due would be escrowed at closing and that any touch-up or follow-up items would be handled by Madison within a reasonable time after the closing. The agreement also stated that the, seller would provide "materials of good quality and perform the construction of [the] house" in accordance with the specifications and blueprints attached thereto, and more particularly "in accordance with the CT Page 5817 standard of materials and workmanship displayed" in the construction of a similar home by Madison known as Lot No. 7 on Balaz Road in Willington which the buyers had viewed and found to be acceptable and well constructed, and that the "[s]eller warrants against any defects in workmanship or materials in accordance with statutory warranties."
In June of 1989, Paul F. Mitchell (who will be referred to hereafter as the plaintiff) lived with his wife and two children in a home that they owned in York, Pennsylvania, which was to be sold on July 17, 1989, because he had accepted the position of director of the department of dentistry at Saint Francis Hospital in Hartford, and it was therefore essential that he find suitable housing for his family in Connecticut on or about the date of that closing. He had been shown and had thoroughly inspected the completed salt box style home built by Madison on Balaz Road in Willington, the "model" referred to in the bond for deed that had impressed him as being suitable for his family's needs, and it had also been represented to him by both the real estate agent and the builder that because of the fact that it was a "truss-built" home, it would have greater structural strength and rigidity because the use of trusses was a better method for framing a house.
The Mitchells moved into the house a day or two after the closing which was held on August 4, 1989, and shortly thereafter, according to the plaintiff's trial testimony, two or three inches of water seeped into the basement after a rainfall and they had to remove and dry out the excess furniture and personal articles that had been stored there and move them to the garage. This was of particular concern to the plaintiff because he had carefully checked the basements of the houses on Balaz Road including the comparable "model" and had found no signs of dampness in any of them.
When the plaintiff reported the basement water problem to him, Morton attempted to correct the condition by drilling holes in the footing despite the plaintiff's protests that if he did so the problem would only get worse. The plaintiff's testimony at the trial was that water continues to get into the basement and that the cellar floor has permanent wet marks and water stains as a result.
After they had moved into the house, the plaintiffs were also concerned about the items on the pre-closing inspection punch CT Page 5818 list which had not been completed or corrected after the closing, as required under the bond for deed which expressly prohibited any escrow, but also provided that the seller's obligation to complete the punch list items survived the closing and "shall be handled by Seller within a reasonable time" thereafter. Those items, in addition to the dampness in the basement, included interior finish work and painting as well as cracks and imperfections in the driveway which the builder attempted to correct by applying more asphalt which resulted in water coming into the garage.
The plaintiffs were also advised by the real estate agent in a letter to them about the punch list items dated August 28, 1989, that they were not to "communicate with anyone other than me when you have a problem." The plaintiff also testified that in early November he and his wife had reached the point where they thought that none of the remaining work would ever be done and they were so distraught about the situation that they listed the house for sale with the realtor on November 6, 1989.
Later that month, around Thanksgiving, the plaintiff noticed that there were cracks appearing in the sheet rock and other conditions in the house that he observed which led him to believe that, in his words, "something was drastically wrong with the structural integrity of the house [although] as lay people at that time we didn't really know what that was." He took photographs at that time in various parts of the house showing separation and cracking of the sheet rock, separation of the baseboards from the floors and the displacement and dropping of the trusses in the basement, as well as spaces between window frames and walls, and between doors and door frames.
After Morton was told about the movement, shrinking and settlement problems that the Mitchells had observed, he sought the advice of personnel of the O'Connor Lumber Company (O'Connor), of Westfield, Massachusetts, that regularly supplied the pre-fabricated building "kits" used in the construction of Madison's "truss-built" homes. An employee of O'Connor, Larry Sartori, inspected the house at Morton's request on December 5, 1989, and stated in a written report of his inspection that the center beam in the basement was set too low and suggested that it be raised, and that the trusses along the stair wall also be raised and that a new header should be installed.
Morton then informed the plaintiff that it was Sartori's CT Page 5819 opinion that the conditions that the Mitchells had reported could be corrected by simply jacking up the house, and thereafter Morton proceeded to do so. However, after Morton's personnel had, in reliance on O'Connor's advice, attempted to do so, the same conditions persisted and additional problems manifested themselves, by way of further separation of the sheet rock, as well as separation of trim and misalignment of doors in areas of the house where they had not been visible to the Mitchells prior to the builder's jacking up of the house in December.
After the attempted corrective work was commenced in December of 1989, the plaintiff took additional photographs that showed that the basement steps were "sagging" and he testified that "it became quite dangerous to walk down them" because the creaking and moving of the steps became more pronounced after the jacking and that "you actually could pull the steps up with your hands." He also noticed, in particular, as shown in the photographs, that after Morton's workers started jacking up the central beam, the hardwood floor between the kitchen and the hallway leading to the foyer, was splitting and that "when [he] walked along this area, the floor would bounce."
Before Morton and his crew put the jacks in place in the basement, the plaintiff told him that he thought something more than simply jacking up the house might be required, and apart from questioning the advisability of doing so, he was also concerned about the lack of experience of the workers involved in the operation because Morton had told him that he had never used that procedure before in the course of his experience as a builder. After the work had started, Mitchell expressed these and other concerns that he had, in a letter to Morton dated December 26, 1989, in which he stated that Sartori, the O'Connor employee who had done the inspection, had told him that one of the deficiencies he had observed was that the stronger "girder" trusses were not placed as they should have been around the stairwells and the header.
He stated in his letter that when Morton's workers placed the jacks under the support system, they placed a two by four board on an angle to support the steps which did not seem to be adequate or safe for that purpose, and he was also concerned that Sartori's instructions had been misunderstood or were not being followed because the trusses had not been brought to an even horizontal plane and that because "[a]ll elements have not dropped evenly, [it would] be a complicated correction." The CT Page 5820 letter also referred to the consequences of the builder's "inability to build us a home of the quality promised" and noted that since the closing in July, "we cannot lead a normal life, since our focus has been on waiting for workmen to . . . complete or repair work that should have been done correctly in the first place," and concluded by asking when Morton would proceed to complete the "work on the support system" as had been promised.
In the course of the plaintiff's direct testimony, he identified photographs that he had taken of the house next door to his, that had also been built by Madison and was of similar style and construction, and they were marked as exhibits in support of his claim that the house was not constructed as provided in the bond for deed "in accordance with the standard of materials and workmanship displayed in other houses constructed by [Madison] within the same subdivision" as well as the other houses, including the "model" that had been shown to him on Balaz Road, and that the house that he had contracted to have built was structurally, and in other important respects, not the "same house" that was contemplated by him when he signed the agreement. He also testified that the deficiencies in the construction of the house and their consequences had affected his family in their daily lives because they feel that the structure is not safe and it is his belief that the house has been rendered valueless because of its lack of structural integrity, that he knows of no way that he can correct the situation, and that he is unable to sell it.
The testimony of Michael Morton, the president and sole stockholder of the defendant corporation can be summarized as follows.
Morton's supervising on-site employee and project manager for the construction of the Mitchell residence was Ken Scott, and he was responsible for the coordination of the work of the various subcontractors and for the timely delivery of the required materials to the job site. His background was in the field of accounting and he had no particular experience in any of the building trades involved in the process of home construction, and Morton acknowledged that he could "honestly say [that Ken Scott] didn't have the expertise to direct anybody how to do anything specifically", and that he was more of an "expediter certainly than to be giving directions as to how to build a house."
Morton recalled that some time in the fall of 1989 he went to CT Page 5821 the Mitchells' home in response to their complaints about conditions in the structure that were unrelated to any of the punch list items, and that in the course of his inspection he observed that "the floor system was beginning to sag" around the basement stairwell and it appeared to him that "their stairway was drooping down." He then contacted Larry Sartori, O'Connor's vice president for engineering and manufacturing, because the framework and the tilt-up walls were engineered and manufactured by that company and he relied upon Sartori's advice because O'Connor was Madison's regular supplier of the pre-fabricated building kits for the houses that were under construction in his developments.
Morton stated that the sagging of the stairs seemed to have been caused by the failure of the trusses on either side to give them adequate support and that they placed jacks in the basement to raise the staircase "back where it belonged." His purpose was to build walls on either side underneath the trusses to carry the weight above so as to remedy whatever defects there may have been in those supports, and that after that had been done, the jacks would have been removed and any other necessary corrective work would then be done, including the replacement of the kitchen floor which had apparently dropped because of the insufficiency of the supports below.
The reason given by Morton for his failure to complete what he believed to be the appropriate corrective work on the house after only one third of it had been done, was that although he was not present and had no personal knowledge of the incident, he was told by one of his employees that when they returned to the house to resume the jacking, Mrs. Mitchell had directed them to stop working and to leave the premises. The plaintiff's recollection of what happened on that day was that after his wife called him and told him that the builder's employees were there to continue their work, he told her that he wanted to speak to Morton directly before any further raising of the house was to be done, and the court accepts the plaintiff's testimony as to that disputed factual issue as being the more credible and reasonable explanation because it is consistent with the letter that Mitchell wrote to Morton on December 26, 1989, in which he articulated his concerns about the attempted remedial work that the builder had undertaken.
Morton also testified that he relied on the quality of the materials supplied by O'Connor in its building kits and upon CT Page 5822 Freestyle as the framing contractor for the actual placement and framing of the component parts of the Mitchell residence while it was being built and that Madison had no part in, or responsibility for, that phase of the construction. He also stated that he had no reason to believe or to anticipate that there would be any problems with either the materials or the workmanship because both companies had worked successfully with him in the past in supplying those materials and installing them into the houses that were in the process of construction.
It was not Morton's typical or customary practice to inspect the work of his subcontractors after it was completed and before they were paid because he assumed that their phase of the work had been done properly. He also relied on the fact that the town's building official had presumably made a rough frame inspection, and although he had no personal knowledge that such a visual inspection had actually been made, the framing must have been approved and certified or he would not have been permitted to proceed with the next stage of the construction of the Mitchell home.
The lumber supplier's representative, Sartori, who had inspected the house at Morton's request, and whose written report and recommendations to Morton for correcting the conditions that the Mitchells had observed and reported were accepted and exclusively relied upon by Madison, discussed his findings with the Mitchells at their home at the time that he made his inspection. Morton did not attend that meeting but was represented by a recently hired young employee whose first name was Todd and who had been designated to supervise the installation of the jacks in the basement because Morton felt that he had some familiarity with the use of jacks in the remodeling of old homes, although neither he nor Morton had ever attempted to jack up truss beams in the course of their experience in the construction of truss-built houses.
In the course of that meeting, Sartori mentioned three possible causes for the problems with the house, first, that the trusses were improperly installed by the framers, second, that the trusses were improperly marked and identified by O'Connor prior to packaging and shipment, and third, that they were not engineered by O'Connor so as to sufficiently support the load that was required. Although Sartori could only speculate about the actual cause of the apparent structural failure, Morton did not retain a structural engineer at that time to examine the CT Page 5823 extent of the deflection in the truss joists because he relied upon O'Connor as the licensed truss manufacturer who furnished the prefabricated and prepackaged building kit and did not feel that it was "his job to determine quality standards."
Kenneth E. Griffes, a licensed professional engineer, who inspected the Mitchell residence at their request in February, 1990, was called by the plaintiffs as an expert to testify about the results of his inspection and to state his opinions on the issues of liability and of damages under the facts of this case. His qualifications, which were not challenged, included over thirty years of experience in the field of structural engineering involving commercial and residential construction, his primary activity with respect to home construction being to act as a consultant to architects who design homes, and his consulting work also regularly included not only advising clients about construction methods but also estimating the costs of proposed new structures.
Griffes met the plaintiffs for the first time when he was asked by a Hartford area builder who had been a client of his to go with him to their house in Willington because of problems that they had been having in their home. When the Mitchells started taking them through the house, the first thing they noticed was a "decided dip" in the hallway from the front door to the kitchen which measured five-eighths of an inch and that indicated to Griffes that the floor supports were defective or were separating from the floor surface.
When they went down to the basement they saw a deflection or bending of one of the truss joists measuring three quarters of an inch which exceeded accepted engineering standards, and also noted splitting along the sides of the basement stairs and that they seemed to be entirely unsupported at the landing which he considered to be a serious and unsafe condition. In other parts of the house they observed ill-fitting doors, sloping treads on the stairs to the second floor, a dip in the hallway of that floor similar to the one on the first floor and found that the framing system in the attic was not the same one shown in the building plans.
After he had completed his tour of the house, he told the Mitchells that they had a structural problem that went beyond merely the poor workmanship that he had observed, and that in order for him to find the causes and to offer solutions he would CT Page 5824 have to make a complete and detailed inspection and study of the structure. On the very next day, February 8, 1990, he went to the house again for another walk-through with a group of people that included O'Connor's engineer, Sartori, as well as Morton, who Griffes felt seemed to be indifferent and unreceptive to his attempts to discuss his concerns, and he recalled that at one point Morton told him that if the hearth was improperly framed as Griffes had suggested, it was the mason's responsibility and not Morton's.
On February 17, 1990, Griffes and an architect who was assisting him, made a day-long complete and detailed examination of the structural elements of the house, which included the taking of multiple measurements of each of the eighteen joists at five different points in each truss joist and submitted his findings and recommendations in a written report to the Mitchells. He also supplemented his report with a cross-sectional sketch of the building to illustrate his conclusions concerning the effects of the jacking up of the house by the builder on its structural integrity.
Griffes testified that in all his years of experience as a structural engineer he had never heard of jacking up a completed and permanent residential building as being a recognized or approved method for correcting or eliminating defective structural conditions, because exerting a lifting action in that manner against the entire frame could not possibly accomplish that purpose or produce any such correction. He also stated that although he did not know the nature or extent of the jacking that took place on and after December 5, 1989, it was his opinion that whatever was done or attempted by the builder caused irreparable damage to the framing system of the Mitchells' home.
In the course of his testimony, Griffes expressed his opinions as to the conformity of the structure to the basic building code, to sound engineering standards and standards of good workmanship, and also stated his opinion as to its safety and habitability as a residential dwelling. All of his opinions were based on his education, training and experience as a structural engineer, the inspections that he had made of the Mitchell house and of the house next door that was of similar style and construction as well as on the numerous photographs that had been taken by Griffes during his inspection and by Mitchell both before and after the jacking began on or about December 5, 1989. CT Page 5825
His conclusions were that the house did not conform to the structural requirements of the basic building code, that it was not built in accordance with sound engineering standards and that it did not meet accepted standards of good workmanship. He also stated that his opinion was that the house in its present condition is unsafe and structurally hazardous, and that it was not fit for habitation under the standards of the basic building code.
It was also his opinion that the "erratic condition of defects that exist throughout the house" cannot be repaired so as to put it into compliance with the building code. He stated that the only way to rectify the situation was to demolish and remove the existing superstructure and replace it with a finished and properly constructed superstructure that meets the requirements of the building code.
He estimated that the cost for rebuilding the house itself above the existing foundation would be seventy-five dollars per square foot for the 2,040 square foot house floor area, or $153,000.00, that the cost of demolition would be not less than $15,000.00 and that the repairs required to correct the water problem in the basement and control the storm drainage about $10,000.00 for a total of $178,000.00. He stated that he had considered the cost of selective demolition and selective repair as an alternative and concluded that demolition and rebuilding would be the least expensive way to remedy the situation.
The only other expert who testified at the trial was Robert M. Dawson, III, a witness called by Freestyle, and a principal in the architectural and engineering firm of Russell Dawson, who was a 1955 graduate of the Massachusetts Institute of Technology, and a registered professional engineer in Connecticut and six other states. He accompanied Griffes in a walk-through of the Mitchell home on October 9, 1991, and observed the deflection and sagging of truss joists in the basement and a settlement of the building, particularly around the center stairwell, which he attributed to the jacking of a main beam in the basement.
It was his opinion that the joists were still capable of supporting the forty pound per square foot minimum "life load" requirement of the building code and that the house was safe but the stairway was clearly unsafe because it was not properly framed or supported. He also stated that the house was CT Page 5826 "habitable" in his opinion based on his definition of that term which was "a building or house [that] conforms to standards of the governing authorities to allow somebody to live there."
He stated that in his opinion, although there were clearly serious defects and deficiencies in workmanship "that obviously are not pleasant to live with", they could be remedied by measures short of demolition and total reconstruction. He could not state what specific repairs would be, required or how they should be made because the structural defects would first have to be identified "in very specific terms" and then it would have to be determined whether a particular defect could be corrected by means other than complete demolition. He also referred to Griffes' opinion that the jacking under the main beam had affected the structural integrity of the roof and stated that it was not a structural defect, but a cosmetic one, because "[i]t may not impair the structural ability of the rafters to do their job."
Counsel for the plaintiffs objected when Dawson was asked to give his opinion as to the cost of repairs on two grounds, first, that a proper foundation had not been laid for such an opinion, and second, that his written report had not included any cost estimate nor had it been disclosed that it would be the subject of his testimony. Counsel for Freestyle acknowledged that the required disclosure had not been made and the court sustained the objection.
In the course of Dawson's cross examination by plaintiffs' counsel, he testified that the jacking had placed a serious strain on the trusses, and although he had not taken any measurements as Griffes had done, his opinion was that the elastic limits of some structural members had been exceeded. He also agreed that the jacking operation had created structural problems that had not existed before the jacking was started, and that if the truss beams have exceeded their elastic limits and are permanently deformed the condition would be a very difficult one to correct.
Dawson also stated that he found a number of building code violations such as sloping floors, and stairs and that the fastening and installation of the stringers of the basement stairs was also "another very serious violation [and that he] would feel uncomfortable walking up and down those stairs in that condition without some corrective measures right now." He agreed CT Page 5827 that Griffes' cross-sectional sketch of the effects of the jacking action on the various parts of the structure was accurate and that if he were going to do a full engineering study and evaluation of the home he would go about it in the same way that Griffes had done.
Freestyle called two other witnesses, Donald Grenier, its general manager, and Harold Caron, who was one of the owners of the company. Caron, who was at the job site every day and personally supervised the work that was being done on the Mitchell house, said that the stairway that was placed in the basement was only a temporary one and that Freestyle "had nothing to do with the construction of the stairway and its surrounding framework" because the concrete floor had not yet been installed. He also stated in response to a question that was put to him on cross-examination that it was "very possible" that the permanent installation and carpentry was done by Ken Scott, Madison's job coordinator and supervisor.
Caron also testified that he distinctly remembered that he had done the complete installation of the stairway and the surrounding partition in the house next door to the Mitchell home although it was not his customary practice to do so. He also identified the photographs that the plaintiff had taken of that house for the purpose of comparing it with the basement stairwell and supports in his own house as the one that he had worked on.
The court concludes that based on its review of the credible and essentially undisputed evidence in this case, as summarized above, the defendant did not construct the plaintiffs' home in accordance with the standard of materials and workmanship displayed in other houses that it built in the same subdivision and on Lot #7, Balaz Road, as required under the contract, and therefore finds the issues for the plaintiffs under the first count of the complaint. The court also finds the issues for the plaintiffs under the second count which alleges that the defendant breached the statutory express warranties under §47-117 of the General Statutes, because the method of construction was expressly warranted, as was the workmanship and materials, and the structure did not conform to the models which were "made a part of the basis of the bargain" within the meaning of the statute.
As to the third count the court finds that the defendant breached the implied warranties under § 47-118 of the General CT Page 5828 Statutes that the dwelling was free from faulty materials, and constructed according to sound engineering standards and in a workmanlike manner. The negligence claims alleged in the fourth count have also been clearly established by the plaintiffs based on the conclusions of both experts that the jacking operations initiated by the defendant in December of 1989 created structural problems that had not existed before the jacking started, and accordingly, the issues of liability under the negligence count are also found in favor of the plaintiffs against the defendant.
 I
The arguments advanced by the defendant in its post trial brief are first, that the plaintiffs have not proved that Madison breached the implied warranty of habitability under § 47-118
(a)(4) of the General Statutes as alleged in the third count of the complaint, second, that the court should reject Griffes' opinion that the house cannot be repaired and must be demolished and reconstructed, and third, that the plaintiffs have failed to offer any evidence of diminution of value which the defendant asserts is an essential element of their claim for damages.
In support of its claim that the Mitchells' house is habitable and safe, the defendant relies on the fact that a certificate of occupancy was issued by the town's building inspector prior to the closing and that it has never been revoked or modified despite the fact the problems he has had with the house have been called to his attention by the plaintiff. Madison also asserts that "the most compelling evidence eroding the credibility of the plaintiffs' claims" that the structure is unsafe is the fact that they have nevertheless continued to live there.
In this connection, it should be noted that Dawson stated that, in his opinion, and in the engineering sense at least, a house was "habitable" if it conformed to the standards of governmental authorities to allow somebody to live there. It was his opinion, nevertheless, that there were serious structural problems in the house that would be difficult to correct, as well as a number of code violations, the most serious of which was the basement stairway which was unsafe in his opinion and which he would not "feel comfortable" using and that it was something that should be corrected immediately.
The fact that a town sanitary officer issues a certificate of CT Page 5829 occupancy after approving a septic tank system does not protect the builder from liability for negligence where violations of the public health code are subsequently found to exist. Coburn v.Lenox Homes. Inc., 186 Conn. 370, 378 (1982); Rodriquez v.Gilbertie, 33 Conn. Sup. 582, 584 (1976). Similarly, a builder-seller cannot insulate himself from liability under an implied warranty of habitability on the ground that a defective septic system was inspected and approved by the county health department, George v. Veach, 313 S.E.2d 920, 922-23 (N.C.App. 1984).
The defendant's argument that what it refers to as the "continued viability" of the town's certification of a dwelling as fit for occupancy serves to insulate it from liability for a breach of the implied warranty of habitability, ignores or overlooks the added protection given under Connecticut law to new home buyers against a building inspector's negligent, mistaken or premature certification, by means of a statutorily-created implied warranty in favor of the buyer that the "vendor has complied with the building code or [with its] customary application and interpretation [by the] municipality." General Statutes § 47-121. The purpose of that statutory provision was, as noted by our Supreme Court, to impose liability on the builder-seller in such cases for a period limited to three years from the issuance of the certificate of occupancy, because "noncompliance with the building code often will not be immediately apparent to home owners"; Bartone v. Robert L. DayCo., 232 Conn. 527, 535 (1995); and this is particularly true of latent structural defects, such as those in this case, which are claimed to constitute a breach of the implied warranty of habitability.
The rationale for allowing the purchaser of a new home to recover on a theory of breach of an implied warranty of habitability is that it is almost impossible, even for a comparatively an implied warranty of habitability is that it is almost impossible, even for a comparatively sophisticated home buyer, to determine its structural quality since many of the most important elements of its construction are hidden from view and are not discoverable even by careful inspection, and the builder-seller is the only person "who not only had an opportunity to observe [and to discover it] but failed to correct a structural defect, which, in turn, became latent." Smith v. Old WarsonDevelopment Co., 479 S.W.2d 795, 799, 801 (Mo. 1972). A new home owner must ordinarily, and as a matter of necessity, rely on the CT Page 5830 fact that the builder-seller holds it out to the public as being fit for use as a residence, and of being of reasonable quality. Id.
The meaning of terms such as "fit for habitation" or "habitability" is imprecise and susceptible to misinterpretation and it would more accurately convey the meaning of the warranty as used in the context of the sales of new homes "if it were to be phrased in language similar to that used in the Uniform Commercial Code [such as] warranty of merchantability, or warranty of fitness for a particular purpose." Petersen v.Hubschman Construction Co., 389 N.E.2d 1154, 1158 (Ill. 1979). The Illinois Supreme Court noted in Petersen that "no one disputes that the house was at least habitable in that the Petersens could live in it and it was not dangerously unsafe," but it held nevertheless that "[t]he mere fact that the house is capable of being inhabited does not satisfy the implied warranty." Id. 1156, 1158.
In a case where the front steps of a new home began to crack and pull away from the house, and the driveway showed signs of deterioration about six months after the buyers had moved in, a Missouri appellate court held that a breach of the implied warranty of habitability by a builder, even in the absence of a statute recognizing such a warranty, is not limited to structural qualities or structural defects. Christensen v. R.D. SellConstruction Co., 774 S.W.2d 535, 538 (Mo.App. 1989). The court noted that even though the homeowner's expert had conceded on cross-examination that a driveway and stairs are not considered to be part of the "structure" of a house in the engineering sense, "this court refuses to restrict the legal scope of the implied [warranty of habitability] based on [the expert's] understanding and usage of the word `structure' in his engineering experience." Id.
If a new home is not structurally sound because of a substantial defect of construction, such a home is not habitable even under a very "narrow" interpretation of the implied warranty of habitability. Petersen v. Hubschman Construction Co., supra, 389 N.E.2d 1156, 1158 (citing Goggins v. Fox Valley ConstructionCorp., 365 N.E.2d 509, 511 (1977)). Whether or not a particular defect renders the dwelling unsuitable or unfit for habitation requires a determination by the trier of fact "as to whether a reasonable person faced with such a defect would be warranted in concluding that a major impediment to habitation existed." CT Page 5831Banville v. Huckins, 407 A.2d 294, 297 (Me. 1979).
Although the court has found no Connecticut court decisions construing the implied warranty of habitability under the New Home Warranties Act, its review of the case law in other states confirms its belief that the strict standard proposed by the defendant, namely, that the defect must be of such magnitude as to make the structure uninhabitable and unlivable, must be rejected in favor of the test that it must be reasonably suited for its intended use as a residence. See Nastri v. Wood Bros.Homes, Inc., 690 P.2d 158, 163 (Cal.App. 1984). The latter standard is consistent with the view stated by our Supreme Court prior to the enactment of the statute that a new home buyer `is in no better position to discover hidden dangers caused by the negligent construction than is the purchaser of a bottle of perfume'; Coburn v. Lenox Homes, Inc., 173 Conn. 567, 575 (1977); and with the California court's statement in Nastri v. Wood Bros.Homes, Inc., supra, 690 P.2d 163, that "it would be the height of cynicism to allow a shoddy builder to escape liability because his work was not shoddy enough."
For the foregoing reasons, the court finds that the defendant breached the implied warranty of habitability under § 47-118
(a)(4) of the General Statutes.
 II
The defendant's remaining claims are directed to the issue of damages. First, Madison asks the court to reject the opinion of Griffes that the defects that exist throughout the house cannot be repaired so as to put it in compliance with the building code, and that the demolition of the existing superstructure and its replacement with a finished and properly constructed superstructure that conforms to the building code is the only way to rectify the situation, and second, it claims that the plaintiffs are not entitled to recover damages in any event because they have not offered any evidence as to the diminution in value of the building as a result of the deficiencies in its construction.
The defendant's arguments in support of its claim that the court should give great weight to Dawson's opinion as to the remedial measures that should be taken cites his testimony that it would not be necessary to demolish and reconstruct the housein its entirety. (Transcript p. 20) (Emphasis added). As the CT Page 5832 court has already noted in its preliminary statement of the facts, however, he was unable to state what specific repairs would be required or how they should be made, because the physical manifestations of the structural defects would first have to be identified "in very specific terms", and then it would have to be determined whether a particular defect could be corrected by means other than demolition or removal.
Dawson also stated that Griffes' cross-sectional sketch of the effects of the jacking on various parts of the structure was a "good depiction", and that he agreed with it, but that he "didn't go into that kind of detail [or] measure anything to the limits [that] Griffes did, obviously." (Transcript, p. 53). He also said that if he were to do a full engineering study and evaluation of the home he would go about it in the same way that Griffes had done, and he also stated that he had not inspected the house next door to the Mitchells' for purposes of comparison, as Griffes had done before he submitted his written report of his observations and conclusions to the plaintiffs.
Both experts also agreed that the jacking that was attempted by Madison was ill-considered, at best, and served only to create or to further aggravate what Griffes described as the "erratic condition of defects" throughout the house, and, according to Dawson, it had placed a serious strain on the structural members, and if the truss beams had exceeded or were to exceed their elastic limits, the jacking may have "permanently deformed" the frame. It should also be noted that the alternative of "selective demolition and selective repair" recommended by Dawson was considered and rejected by Griffes, because in his opinion any such "solution" would be more expensive than the demolition and rebuilding that he had proposed.
For the purposes of assessing the relative weight and sufficiency of the opinions of Griffes and Dawson as to whether the deficiencies were correctable and repairable by measures short of demolition and reconstruction, the court has no doubt that both are equally well qualified, in terms of their education, training and experience, to give their opinions as to the remedial measures that would be required to make the structure reasonably suited for its intended use as a residence. It is significant, however, that in terms of the relative weight that should be given to their opinions, Dawson made only one visit to the house on October 9, 1991, which was essentially a walk-through with the plaintiff and Griffes that took no more CT Page 5833 than three hours, while Griffes made two such inspections, on February 7, 1990, and February 8, 1990, which were followed by a day-long complete and detailed examination of the structural elements of the house on February 17, 1990 by Griffes and an architect.
At the time of his initial visit to the house, Griffes did not have a sufficient basis for stating any opinion to the Mitchells other than that they had a "structural problem", and that before he could determine what the causes were or what solutions to propose, he would have to make a complete and detailed inspection and study of the structure. On his second visit, he went through the house with a group of people who had been directly involved in the different phases of its construction, including, according to the plaintiff's testimony, representatives of Freestyle as well as Sartori, Morton and "Todd", and presumably received input from them in the course of their discussions that were helpful to him in reaching his final conclusions.
The factors to be considered in determining the relative weight and sufficiency of expert and opinion testimony include the relative opportunities that the expert witnesses had for study and observation of the subjects about which they testify; 31 A Am.Jur.2d, Expert and Opinion Evidence § 129; and an expert's opinion must be evaluated in light of the expert's opportunity to come to a reasoned conclusion. Seymour v. Seymour,180 Conn. 705, 712 (1980).
Based on the foregoing considerations and its review of all of the evidence in this case, the court finds that in order to make the building constructed by the defendant on Lot No. 1, Lindsey Lane, in Willington, reasonably suited for its intended use as a residence, the existing superstructure must be demolished and removed, and replaced with a finished and properly constructed superstructure that meets the requirements of the building code and is constructed in accordance with the standard of materials and workmanship in other houses that were built in the same subdivision and on Lot No. 7, Balaz Road, as provided in the contract between the parties dated June 9, 1989.
The defendant's final claim is that the proper measure of damages under the facts of this case is the diminution in value of the plaintiffs' home because the cost of restoring it to the condition it would have been if the contract had been performed CT Page 5834 is dramatically larger than the difference in value. Spera v.Audiotape Corp., 1 Conn. App. 629, 633 (1984). In cases involving a breach of a construction contract, damages are measured either by the reasonable cost of construction and completion in accordance with the contract, or by the diminished value of the property if construction and completion as provided under the contract would involve unreasonable economic waste. Levesque v. D M Builders, Inc., 170 Conn. 177, 181 (1976).
The burden of proving economic waste is on the party that breached the contract and that invokes the doctrine in an effort to limit expectation interest damages. Andrulis v. LevinConstruction Corp., 628 A.2d 197 (Md. 1993). "[T]he burden is on the defendant to affirmatively and convincingly prove that economic waste would result from the replacement of the omissions and defects [because] it is the defendant who is seeking to prove a situation whereby he will get equitable relief from a rule of law." Shell v. Schmidt, 330 P.2d 817, 827 (Cal.App. 1958).
The only evidence offered at the trial on the question of economic waste was the testimony of the plaintiffs' expert, Griffes, who stated that he had considered the costs of selective demolition and selective repair, and that it was his opinion that demolition and rebuilding would be the least expensive way to remedy the structural deficiencies that he had identified and described in the course of his testimony. The alternative approach of selective repair rather than demolition was recommended by Dawson, who was called as a witness by Freestyle on the third party complaint, but who was precluded from giving a cost estimate because of the third party defendant's failure to disclose that Dawson would offer an opinion on that subject, and accordingly, if Griffes' opinion is accepted by the court, the issue of economic waste must be resolved in favor of the plaintiffs as a matter of fact.
In any event, the basic flaw in the defendant's argument that the "economic waste" exception should be applied in this case is that the assumption upon which it rests is that "the diminution in market price is the least possible loss to the injured party, since he could always sell the property on the market even if it had no special value to him." 3 Restatement (Second), Contracts § 348, comment (c) (1981). The plaintiff's testimony that the house has been rendered valueless because of its seriously impaired structural integrity, and that he is unable to sell it, coupled with Griffes' testimony that it violates the building CT Page 5835 code and that it is unsafe and structurally hazardous, leads to the inescapable conclusion that its market value in its present condition is dubious at best.
Diminished value may be established by opinion if, based on all the evidence, the opinion is credible and the plaintiff as the owner of the property is qualified to render an opinion of its value, including its diminished value. McCahill v. Town Country Associates, Ltd., 185 Conn. 37, 41 (1981). Homeowners are qualified to testify as to their personal opinion regarding the value, or diminution of value, of their properties and if the defendant in this case wished to challenge the plaintiff's opinion it could have done so through cross examination, or by calling its own witnesses to testify as to value and it had ample opportunity to do so. Tessman v. Tiger Lee Construction Co.,228 Conn. 42, 47 (1993).
For the foregoing reasons, the court finds that the plaintiffs have presented sufficient evidence as to the diminution in value of their house and the costs of reconstruction upon which to award an appropriate measure of damages. The court also finds that Griffes, whose experience as an engineer includes drawing plans and making estimates for building projects, sufficiently qualifies him to make cost estimates for reconstruction based upon recognized and trustworthy sources for such information. See Bryan v. Town ofBranford, 50 Conn. 246, 249-50 (1882).
Accordingly, judgment may enter in favor of the plaintiffs against the defendant, Madison Enterprises of Connecticut. Inc. for $178,000.00 as follows:
 Cost of rebuilding at $75.00 per square foot for 2,040 square feet $153,000.00
Demolition costs 15,000.00
 Basement repairs and storm drainage 10,000.00 -----------
Total $178,000.00
 III
The factual and legal issues raised in the third party CT Page 5836 complaint against Freestyle remains to be considered. Madison, the third party plaintiff, seeks indemnification from Freestyle on two grounds, first, that it was negligent in its construction of the plaintiffs' home and that its negligence was "active and primary" while Madison's was "passive or secondary" under the rule stated in Kaplan v. Merberg Wrecking Corp., 152 Conn. 405
(1965), and second, that there was an oral agreement for indemnification between the parties.
Wherever the party who seeks indemnity was itself guilty of affirmative misconduct which was a proximate cause of the injury or damage that is claimed, it cannot recover unless it is shown that the party against whom indemnification is sought was the party primarily liable for the wrongful act which occasioned the injury for which the plaintiff has been compelled to pay damages.Preferred Accident Ins. Co. v. Musante, Berman Steinberg Co.,133 Conn. 536, 542-43 (1947) The Supreme Court in the PreferredAccident case emphasized the fact that the identifying characteristics and circumstances that justify the court's finding a party primarily liable are "personal participation, personal culpability [and] personal knowledge." Id. 542 (quotingBailey v. Bussing, 28 Conn. 455, 459 (1859).
A party seeking indemnification on a tort theory of liability based on active or primary negligence "must establish four elements: (1) that [the] third-party defendant was negligent; (2) that its negligence, not the third-party plaintiff's negligence, was the direct and immediate cause of the injury; (3) that the third-party defendant had exclusive control of the situation; and (4) that the third-party plaintiff did not know of the charged party's negligence, had no reason to anticipate it, and reasonably could have relied on the charged party to act without negligence." Williams v. Hoffman/New Yorker, Inc., 923 F. Sup. 350,352-53 (D.Conn. 1996). As applied to the facts of this case, the second element requires that Madison prove that Freestyle's negligence, rather than the negligence which was the basis for this court's finding of negligence on Madison's part under the fourth count of the original complaint, was the "direct and immediate cause" of the structural deficiencies in the Mitchells' home which the court has found will require demolition and reconstruction.
The negligence charged against Madison in the fourth count of the plaintiffs' complaint was not limited to its negligence in constructing the house, for which it seeks indemnity from CT Page 5837 Freestyle in its third party complaint, but also alleges that it negligently "performed a series of jacking operations" in December, 1989. This court's finding that Madison was negligent states (supra, p. 17) that its liability for negligence had "been clearly established by the plaintiffs based on the conclusions of both experts that the jacking operations initiated by the defendant in December of 1989 created structural problems that had not existed" before that time.
If the party seeking indemnification is actively negligent or is guilty of an independent act of negligence which is also a cause of the underlying injuries, indemnity is not available as a matter of law. Travelers Indemnity Co. v. Stedman, 895 F. Sup. 742,749 (E.D.Pa. 1995). Moreover, the negligence of a subcontractor that may have caused the original defect is not relevant to property damage that occurs because of a negligent subsequent repair, or attempted repair, after the effects of the former negligence are discovered, because the failed attempt to repair them becomes the sole proximate cause of any subsequent property damage. Seely v. Loyd H. Johnson Construction Co.,470 S.E.2d 283, 287 (Ga.App. 1996).
When a home buyer makes a claim against a builder-seller based on negligent construction, the defendant "cannot escape liability simply by claiming that an independent contractor he hired was wholly responsible for the negligent work [because] the builder-seller holds himself out as having the ability and expertise to build a fit and workmanlike residence. . .". Hudginsv. Bacon, 321 S.E.2d 359 at 366 (Ga.App. 1984). Builder-sellers have the right and the duty to direct and control the work of those who contract to work for them "to the extent that an ordinarily prudent builder would exercise such direction and control to build a fit and workmanlike structure." Seely v. LoydH. Johnson Construction Co., 470 S.E.2d 283, supra, 286.
Even if the disputed factual issue of control over Freestyle's work in the course of construction were to be found in favor of Madison, it is undisputed that it was in exclusive control of the dangerous condition that existed in the basement of the Mitchell home from and after December 5, 1989, until it abandoned its attempts to correct it. Our Supreme Court has recently held that although the absence or presence of exclusive control is ordinarily a question of fact in an action for indemnity, it may be determined as a matter of law where "exclusive control of the situation" is broadly defined as CT Page 5838 exclusive control over the dangerous condition that gives rise to the injured party's claim for damages. Skuzinski v. BouchardFuels, Inc., 240 Conn. 694, 706 (1997).
For the foregoing reasons, the issues are found in favor of the third party defendant, Freestyle, on the first count of the third party complaint, and on Freestyle's third special defense that Madison's claim for indemnification is barred by §52-572k of the General Statutes which prohibits any agreement "that purports to indemnify . . . the promisee against liability for damage arising out of . . . damage to property caused by or resulting from the promisee's sole negligence [as being] against public policy and void . . . ." See Industrial Recycling Systems,Inc. v. Ahneman Associates, P.C., 925 F. Sup. 169, 171 (S.D.N Y 1996).
Harry Hammer Judge Trial Referee